IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM HARRIS, JR., | : | |
| ANGELL HARRIS, | : | |
| LORRIA RUIZ, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| DERRICK JACOBS, | : | |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendants. | : | NO. 11-4685 |
| | : | |
| | : | |

**<u>MEMORANDUM</u>**

BUCKWALTER, S. J.                                                September 18, 2012

Presently before the Court is the Summary Judgment Motion of Defendants Detective Derrick Jacobs and the City of Philadelphia, and the Request for Spoilation Sanctions of Plaintiffs William Harris, Jr. ("William"), Angell Harris ("Angell"), and Lorria Harris-Ruiz ("Lorria") (collectively hereinafter "Plaintiffs" or "the Harris siblings.") For the following reasons, Defendants' Summary Judgment Motion is granted in part and denied in part, and Plaintiffs' Request for Spoilation Sanctions is denied.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter arises out of a domestic dispute that occurred between William and his then-girlfriend Trelana Adams ("Adams") at his home in Philadelphia.  At approximately 11:00 p.m. on the night of November 7, 2008, William and Adams had an argument after Adams discovered messages on William's cell phone from other females.  (Defs.' Mot. Summ. J., Ex. A., Dep. of William Biff Harris, Jr. ("William Dep.") 16:2–5; Am. Compl. ¶¶ 13, 14.)  The fight escalated into

a physical altercation when Adams began to beat William over the head with an alarm clock. (Id. ¶ 15; Pls.' Resp. Opp'n, Ex. A, 11/12/08 Phila. Fam. Court Domestic Abuse Hr'g. Trans. ("PFA Hr'g. Trans.") 13:15–25.)  William apparently pinned Adams down on the bed in an attempt to restrain her and pry his cell phone out of her hands.  (Id. at 10:14–21,13:21–25.)  After the altercation, Adams called the Philadelphia Police to report the incident. (William Dep. 16:18–24.)  When the police arrived at the scene, they arrested William, took him to the local station, and booked him on charges of simple assault.  (Id. at 17:3–16; Am. Compl. ¶¶ 17, 20; Defs.' Mot. Summ. J., Ex. B, 11/07/08 Compl. or Incident Report.)  The police eventually took William to the Emergency Room to have his facial lacerations and contusions treated.  (William Dep. 17:17–22, 18:10–24, 19:1–4.)  Following medical treatment, William returned to jail, where he remained until he was released the following day.  (Id. at 19:5–9, 20:23–24, 21:1–3.)

While William was incarcerated, Adams obtained a Temporary Protection From Abuse ("PFA") Order against him from a Philadelphia Family Court.  (Pls.' Resp. Opp'n, Ex. C, 11/07/08 Temporary Protection from Abuse Order ("Temp. PFA").)  Because the Temporary PFA was in effect at the time of William's release, he was not permitted to return to his home or to have any contact with Adams.  (Id.; William Dep. 21:11–16.)  William therefore requested to have his two sisters, Lorria and Angell, retrieve his car keys and personal items from his home.  (Id.)  The police apparently complied with this request.  Prior to going to William's house, Lorria allegedly spoke to Adams on the phone and told her that she and Angell were going to retrieve William's things. (Pls.' Resp. Opp'n, Ex. E, Statement of Lorria S. Harris-Ruiz ("Lorria Statement").)  During this call, Adams apparently told Lorria that the Temporary PFA gave her the right to keep and use William's vehicle.  (Id.)

Philadelphia Police Officers Michelle Long and John Holt escorted William, Lorria, Angell, and their father to William's home in Philadelphia. (William Dep. 21:13–24, 22:6–18; Lorria Statement.) At all relevant times, William remained in his sister's car parked a few blocks away in an effort to comply with the PFA. (William Dep. 25:3–5.) Upon the group's arrival at the house, Lorria and Angell knocked on the door in the presence of the police, but no one answered. (Id. at 22:6–18, 23:17–24.) The sisters then unlocked and entered the house with a separate set of keys that belonged to Angell. (Id. at 24:18–24, 25:1–2; Defs.' Mot. Summ. J., Ex. C, Dep. of Angell Harris ("Angell Dep.") 14:1–6.) According to the Harris sisters, Officers Long and Holt apparently gave them permission to enter the home with their own set of keys for the sole purpose of retrieving William's belongings, and left the scene shortly thereafter. (Id. at 19:6–7; Lorria Statement.)

Once inside, Lorria and Angell began to search for their brother's things. (Angell Dep. 17:7.) They noticed that lights, a television, and a space heater were all on, and therefore proceeded to call out for Adams to ascertain if she was home, but received no response. (Id. at 17:8–13.) The Harris sisters conducted a thorough search of the house, but were unable to find William's car keys. (Id. at 17:15–19.) Lorria then called Adams, and Adams indicated that she was in rightful possession of William's car and keys pursuant to the PFA. (Lorria Statement; Defs.' Mot. Summ. J., Ex. E, Dep. of Lorria Shin Ruiz ("Lorria Dep.") 22:1–21.) Upon entry into the upstairs bedroom, the sisters discovered two strangers—subsequently identified as Adams's cousin and boyfriend—sleeping in their brother's bed. (Angell Dep. 18:1–16.) The Harris sisters asked the strangers who they were and demanded that they leave William's house, but they declined to do so. (Id. at 18:1–17.) Shortly thereafter, the Harris sisters left the house. (Id. at 18:17–21.) Prior to their departure, Angell took a set of keys from the downstairs foyer, which she believed belonged to her brother. (Id. at

3

18:17–19.)  The women then locked the door behind them.  (<u>Id.</u> at 18:19–20.)  Apparently the door

had a double-sided lock, and therefore the two strangers in the home were locked inside.   (Lorria

Statement.)  The sisters then called the police to report the presence of the two strangers in the house,

and to obtain their assistance in retrieving William's car keys from Adams.  (<u>Id.</u>;  William Dep.

26:5–14.)  They then sat down on the front stoop to await the police.  (Lorria Dep. 36:13–17.)

At this point, Lorria and Angell noticed Adams sitting in their brother's car parked outside.

(Lorria Statement.)  The women approached the vehicle and demanded the keys, but Adams refused

to turn them over.  (<u>Id.</u>)  Officers Holt and Long arrived on the scene again shortly thereafter, and

advised the Harris sisters that, while they could not force Adams to turn over the car keys, they could

request to have the vehicle towed.  (<u>Id.</u>;  William Dep. 26:9–24; Lorria Dep. 29:1–21.)  The officers

then asked Angell to unlock the door so that Adams's cousin and her boyfriend could exit the house.

(<u>Id.</u> at 37:18–24, 38:1–9; Angell Dep. 19:4–11.)  The officers then had a separate discussion with

Adams, during which she gave permission for William to quickly enter the house to retrieve his

belongings. (William Dep. 26:18–24; 27:1–19.)  William then went inside, took his things, and left

with his family without further incident.  (<u>Id.</u> at 28:1–4.)  Lorria video recorded the entire course of

events that took place at William's house that day, and a DVD of this video has been provided to the

Court.  (Defs.' Mot. Summ. J., Ex. F, DVD Recording.)

A few days later, on November 12, 2008, a hearing was held on the Temporary PFA before

the Court of Common Pleas in Philadelphia.  (<u>See generally</u> PFA Hr'g Trans.)  Both Adams and

William testified at the hearing.  Based on their testimonies, the presiding judge refused to enter a

permanent PFA against William and discharged the case.  (<u>Id.</u> at 17:20–21; William Dep. 30:6–9.)

The judge also advised Adams that Willam could lawfully refuse her entry into his home since she

and William were not married and she did not own the house.  (PFA Hr'g Trans. 18:2–9.)

At approximately the same time, the Philadelphia Police Department was conducting an investigation into the incidents surrounding William's arrest.  (Defs.' Mot. Summ. J., Ex. D, 11/09/08 Investigation Interview Report ("Jacobs Investigation Report").)  Detective Derrick Jacobs was assigned to the case.  (Id.)  According to Plaintiffs, Detective Jacobs is personally involved with Adams or is a member of her family.  (Am. Compl. ¶ 51; Angell Dep. 29:11–24, 30:1–24, 31:1–24, 32:1–14.)  Plaintiffs allege that his investigation into the matter was therefore "malicious, incompetent and sloppy."  (Pls.' Resp. Opp'n 7.)  Detective Jacobs apparently only interviewed Adams and her cousin about the incident, but never contacted William, his family, or Officers Long and Holt to discuss the matter.  (Id.)  Based solely on Adams's account of the incident, Detective Jacobs sought and received arrest warrants for William, Lorria, and Angell.  (Defs.' Mot. Summ. J., Exs. H & I, Affs. of Probable Cause.)  All three individuals were subsequently arrested and charged with six felonies and six misdemeanors, including: burglary, retaliation, intimidation, criminal conspiracy, criminal trespass, wire tap fraud, unlawful restraint, terroristic threats, obstruction of justice, false imprisonment, theft by unlawful taking, and receipt of stolen property.  (Defs.' Mot. Summ. J., Ex. G, Phila. Police Dep't Arrest Record ("Harris Siblings Arrest Record").)  William was also charged with violating the Temporary PFA.  (Id.)  Eventually, all of the criminal counts against the Harris siblings were dismissed by the Court of Common Pleas in Philadelphia.  (Pls.' Resp. Opp'n 9.)  Detective Jacobs's case file on the Harris investigation, however, has since gone missing. (Pls.' Resp. Opp'n, Ex. J, 03/16/12 Weisberg-Taylor E-Mails Re: *Harris v. Jacobs* ("03/16/12 E-Mail Exchange").)

Plaintiffs filed their two-count Complaint on September 16, 2011, alleging that Detective

Jacobs and the City of Philadelphia violated their civil rights pursuant to 42 U.S.C. § 1983 and the United States Constitution.  Defendants filed the instant Motion for Summary Judgment on June 5, 2012.  Plaintiffs responded in opposition on July 3, 2012, and Defendant replied on July 13, 2012. Plaintiffs filed their Sur-reply on August 21, 2012.  This matter is now ripe for judicial consideration.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).   Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue

6

of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249.  Summary judgment may be granted when "the evidence is merely colorable . . . or is not significantly probative." Id. at 249–50 (citations omitted).

## III.   DISCUSSION

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004) (internal citation omitted); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002); Bush v. Lancaster City Bureau of Police, No. Civ.A.07-3172, 2008 WL 3930290, at *3 (E.D. Pa. Aug. 26, 2008).  Federal law requires a plaintiff to satisfy two steps in order to properly establish a § 1983 claim: (1) the deprivation of a constitutional right or other federal law, and (2) that a "person acting under the color of state law"

is responsible for the alleged deprivation.  Collins v. City of Harker Heights, 503 U.S. 115, 119–20 (1992).

In the instant case, Plaintiffs aver that Detective Jacobs, acting under color of state law, violated the Fourth Amendment when he maliciously prosecuted them.  (Am. Compl. ¶¶ 70–76.) Plaintiffs also seek to hold the City of Philadelphia responsible for the conduct of its police officers under a theory of municipal liability.  (Id. at ¶¶ 77–81.)  Defendants have moved for summary judgment on the grounds that Plaintiffs lack sufficient evidence to successfully establish their malicious prosecution claim against Detective Jacobs.  (Defs.' Mot. Summ. J. 5–9.)  In the alternative, Defendants assert that Detective Jacobs is entitled to the affirmative defense of qualified immunity.  (Id. at 9–10.)  Defendants likewise allege that summary judgment should be granted in the City's favor because Plaintiffs have not established the presence of a policy, practice, or custom upon which municipal liability can be premised.  (Id. at 11–13.)  In response, Plaintiffs aver that Detective Jacobs's actions here do not entitle him to qualified immunity, and that genuine issues of material fact remain as to their malicious prosecution and municipal liability claims.  (Pls.' Resp. Opp'n 13–19.)  Plaintiffs also request the Court to enter spoilation sanctions against Defendants on the basis that they have been prejudiced by Defendants' loss and/or destruction of Detective Jacobs's file related to the Harris investigation.  (Id. at 9–13.)  The Court considers each claim and defense in turn below.

### A.      Malicious Prosecution

A cause of action for malicious prosecution made pursuant to 42 U.S.C. § 1983 must allege the following:

(1) The defendants initiated a criminal proceeding; (2) the criminal proceeding ended

in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of a seizure as a consequence of a legal proceeding.

Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003); see also Henderson v. City of Phila., --- F. Supp. 2d ---, 2012 WL 1071225, at *3 (E.D. Pa. Mar. 30, 2012) (internal citation omitted). "If Plaintiffs have not proffered evidence sufficient to create a triable issue of fact as to all five prongs, their malicious prosecution claim must fail as a matter of law." Domenech v. City of Phila., No. Civ.A.06-1325, 2009 WL 1109316, at *9 (E.D. Pa. Apr. 23, 2009). In the instant case, Defendants concede that Plaintiffs can satisfy the second and fifth elements of their malicious prosecution claim. (Defs.' Mot. Summ. J. 5.) As to the other three elements, the Court finds that genuine issues of material fact remain in the record, thereby precluding summary judgment.

The first element provides that the defendant must have initiated a criminal proceeding against the plaintiff. It is undisputed from the record that criminal proceedings were initiated against William, Angell, and Lorria because all three plaintiffs were arrested, charged with several felonies and misdemeanors, and subsequently cleared of all charges. (Affs. Probable Cause; Harris Siblings Arrest Record; Pls.' Resp. Opp'n 9.) The arrest warrants for Plaintiffs were based upon affidavits of probable cause crafted by Detective Jacobs. As such, it is evident that Detective Jacobs played a significant role in effectuating Plaintiffs' arrests. Defendants assert, however, that Detective Jacobs cannot be held liable because, as a detective of the Philadelphia Police Department rather than a prosecutor, he did not have the authority to initiate proceedings here. (Defs.' Mot. Summ. J. 6–7.)

"In most cases, 'a prosecutor rather than a police officer initiates a criminal prosecution.'"

9

Milbourne v. Baker, No. Civ.A.11-1866, 2012 WL 1889148, at *11 (E.D. Pa. May 23, 2012) (quoting Zeglen v. Miller, No. Civ.A.04–1940, 2008 WL 696940, at *8 (M.D. Pa. Mar. 12, 2008) (internal citation omitted); Albright v. Oliver, 510 U.S. 266, 279 n.5 (1994) (Ginsburg, J., concurring) ("The principal player in carrying out a prosecution . . . is not [a] police officer but [a] prosecutor."); Harris v. City of Phila., No. Civ.A.97–3666, 1998 WL 481061, at *5 (E.D. Pa. Aug. 14, 1998) ("In most circumstances, a plaintiff can not proceed against a police officer for a claim of malicious prosecution because a prosecutor, not a police officer, 'initiates' criminal proceedings against an individual.")) (further citations omitted).  A malicious prosecution claim against a police officer can proceed, however, if the plaintiff can show that the officer "'fail[ed] to disclose exculpatory evidence to prosecutors, ma[de] false or misleading reports to the prosecutor, omit[ted] material information from the reports, or otherwise interfere[d] with the prosecutor's ability to exercise independent judgment in deciding whether to prosecute.'" Milbourne, 2012 WL 1889148, at *11 (quoting Zeglen, 2008 WL 696940, at *8; Telepo v. Palmer Twp., 40 F. Supp. 2d 596, 610 (E.D. Pa.1999)).

        Here, a reasonable jury could find that Plaintiffs satisfy the requirements of the first element because Detective Jacobs possessed or could easily obtain evidence that was potentially exculpatory. First, Detective Jacobs easily could have consulted with Officers Long and Holt—officers in his own Department and building—about the incident, but did not do so prior to filing the affidavits for probable cause.  (Pls.' Resp. Opp'n, Ex. I, Dep. of Detective Derrick Jacobs ("Jacobs Dep.") 36:11–15.)  Even more so, the record indicates that, prior to filing the affidavits, Detective Jacobs had in his possession the video recording of the events that occurred at William's home on November 8, 2008.  (Affs. Probable Cause.)  The Court has viewed this video recording, and, based

on its contents, finds that a reasonable juror could credibly ascertain from it that Plaintiffs did not

engage in unlawful conduct.  (See DVD Recording.)  For example, William was arrested and

charged with violating the Temporary PFA that was in place against him at the time, but he is

noticeably absent from the video.  (Id.)  In fact, at his deposition, William testified that he remained

in his sister's car parked several blocks away in an effort to comply with the PFA, and only exited

the vehicle when Officers Holt and Long arrived at the scene and Adams gave him permission to

quickly enter the house to obtain his belongings.  (William Dep. 25:3–5, 26:21–24, 27:1–24,

28:1–5.)  Moreover, at their depositions, Officers Long and Holt both testified that they did not

believe that any unlawful conduct occurred at William's residence during the incident in question.

(Pls.' Resp. Opp'n, Ex. G, Dep. of Officer Michelle Long ("Long Dep.") 24:9–16; Pls.' Resp. Opp'n,

Ex. H, Dep. of Officer John Holt ("Holt Dep.") 10:3–9.)  Detective Jacobs, however, chose not to

consult either officer prior to obtaining the arrest warrants.  As such, it is evident that genuine issues

of material fact remain regarding whether Detective Jacobs failed to consider potentially exculpatory

evidence prior to initiating the criminal proceedings against Plaintiffs.

     The Court next considers the third element of malicious prosecution, *i.e.* whether the criminal

proceedings were initiated against Plaintiffs without probable cause.[1]  In the context of  malicious

---

[1] Plaintiffs spend the majority of their briefing arguing that probable cause is eviscerated when "a police officer knowingly or recklessly gave false information to obtain an arrest warrant or purposefully omitted exculpatory information[.]" (Pls.' Resp. Opp'n 13.)  This standard however, applies in § 1983 actions *for false arrest*, and not in the malicious prosecution context. For example, in Cummings v. City of Phila., No. Civ.A.03-0034, 2004 WL 906259 (E.D. Pa. Apr. 26, 2004), another court in this Circuit previously recognized that:

    A plaintiff may succeed in a § 1983 action *for false arrest* made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and that

prosecution, probable cause is defined as: "proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." Domenech, 2009 WL 1109316, at *10 (citing Lippay v. Christos, 996 F.2d 1490, 1502 (3d Cir. 1993)) (further citation and quotation omitted).  In making such a determination, officers should consider the totality of the circumstances, and should "weigh the inculpatory evidence against any exculpatory evidence to determine whether a reasonable person would believe that an offense has been . . . committed by the person to be arrested." Cummings, 2004 WL 906259, at *7 (citing Wilson v. Russo, 212 F.3d 781, 791 (3d Cir. 2000)); see also Wooleyhan v. Cape Henlopen Sch. Dist., No. Civ.A.10-153, 2011 WL 1875710, at *9 (D. Del. May 17, 2011) (Baylson, J.) (citing Wright v. City of Phila., 409 F.3d 595, 603 (3d Cir. 2005)).  Moreover, in assessing whether an officer had probable cause at the time of the contested action, courts should not examine the officer's conduct with the benefit of 20/20 hindsight, but rather should focus their inquiry on whether the officer's belief was reasonable "in light of the information [he] possessed at the time of the arrest." Wooleyhan, 2011 WL 1875710, at *9 (internal citation omitted).

Typically, once a police officer has determined that probable cause exists, he has no duty to further investigate the complainant's accusation or interview other witnesses in an effort to find exculpatory evidence. See Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 790 n.8 (3d Cir. 2000);

---

such statements or omissions are material . . . to the finding of probable cause.

Id. at *5 (internal citations omitted) (emphasis added).)  Here, nothing precluded Plaintiffs from asserting a claim for false arrest against Detective Jacobs.  Indeed, the primary case that they rely upon in their briefing discusses probable cause in the context of a false arrest.  Plaintiffs chose, however, to solely bring a claim for malicious prosecution against Detective Jacobs.  The Court's inquiry is therefore limited to whether Plaintiffs have proffered sufficient evidence to make out their malicious prosecution claim against Detective Jacobs.

Wooleyhan, 2011 WL 1875710, at *9 ("But once the police have sufficient facts to establish probable cause, there is no constitutional duty to further investigate in hopes of finding exculpatory evidence."). This general rule, however, is not absolute.  An officer may have a duty to further investigate when plainly exculpatory evidence or circumstances indicating a witness's unreliability are known. Id.  In such situations, courts should consider whether the exculpatory evidence that was available to the officer at the time would have outweighed any inculpatory evidence in making his finding of probable cause.  Id. at *10.

Here, neither party disputes that Detective Jacobs based his affidavits of probable cause solely on the statements made to him by Adams and her cousin.  Despite the fact that he either had, or could have easily obtained, potentially exculpatory evidence, Detective Jacobs nonetheless proceeded to file the affidavits upon which Plaintiffs' arrest warrants were based.  Based on these warrants, Plaintiffs were arrested and charged with *six* felonies and *six* misdemeanors, including: burglary, retaliation, intimidation, criminal conspiracy, criminal trespass, wire tap fraud, unlawful restraint, terroristic threats, obstruction of justice, false imprisonment, theft by unlawful taking, and receipt of stolen property.  (Affs. Probable Cause.)  While Detective Jacobs may not have been legally required to investigate any further after speaking with Adams, a reasonable juror could certainly find from the evidence of record here that he lacked probable cause to arrest and charge Plaintiffs for the excessive number of crimes listed above based solely on Adams's statements to him.

Finally, the fourth element of malicious prosecution requires the Court to consider whether Detective Jacobs acted maliciously or for a purpose other than bringing Plaintiffs to justice when he arrested them.  In their Amended Complaint, Plaintiffs allege that, upon their information and belief,

13

Detective Jacobs was personally involved with Adams in some way and that this relationship "created bias and prejudice" in his decision to arrest them. (Am. Compl. ¶¶ 51, 52).   More specifically, at her deposition, Angell Harris testified as follows:

> Q:    [ ] Do you have any independent knowledge, other than what your brother told you about a relationship, [about] any type of relationship between Detective Jacobs and Trelana Adams?
> A:    Yes.
> Q:    What is that?
> A:    She actually told me that he was her cousin.
> . . .
> Q:    How did that come up in conversation?
> . . .
> A:    . . . [I]t was just a conversation with me and her was having.  And that's when she told me she said, well, he's my cousin.  This is his name on the line.  I can't go back now, because he's going to have to files charges against me, he said.  That's what she told me.

(Angell Dep. 29:11–22, 30:14–15, 32:7–14.)  On the other hand, Detective Jacobs specifically stated the following at his deposition:

> Q:    Are you related to Ms. Adams in any way?
> A:    Not at all.
> Q:    Familial relations?
> A:    . . . not at all.
> Q:    Have you ever met her before this incident?
> A:    No, not at all.
> Q:    How about after the incident? Do you still keep in contact with Ms. Adams?
> A:    No, I do not.
> Q:    Can you categorize your relationship with her as in any way "social"?
> A:    Not at all.  In no way is my relationship with Ms. Adams social.
> Q:    Have you ever gone out to dinner with her; you know, had drinks with her; gone to a movie; gone to the mall; anything like that?
> A:    Not at all.

(Jacobs Dep. 20:7–23.)  This discrepancy in the evidentiary record creates a genuine issue of material fact as to Detective Jacobs's relationship with Adams.  Although the Court is cognizant of the fact

14

that this is a mere testimonial discrepancy, it is nonetheless an issue of fact from which a reasonable jury could find that Detective Jacobs was motivated by malice or for a purpose other than bringing Plaintiffs to justice when he arrested them.  Moreover, it is not the Court's role at the summary judgment stage to make credibility determinations regarding the evidence before it.  See Boyle v. Cnty. of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (internal citations omitted).  Rather, the Court's sole duty at this stage is to assess all the evidence before it in the light most favorable to the non-movant—in this case, the Harris siblings—and to draw all justifiable inferences in that party's favor to determine whether any genuine issues of material fact remain based on the record.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (internal citations omitted). Given the presently conflicting evidentiary record on this point, the Court cannot conclusively find at this time that Defendant did not act maliciously when he effectuated Plaintiffs' arrests.

In sum, the Court finds that genuine issues of material fact remain regarding Plaintiffs' malicious prosecution claim.  Summary judgment is therefore denied on Count I.

### B.    The Qualified Immunity Doctrine

Defendants further allege that, in the event that the Court finds that genuine issues of material fact remain regarding the malicious prosecution claim, summary judgment should nonetheless be granted in Detective Jacobs's favor because he is entitled to qualified immunity.  (Defs.' Mot. Summ. J. 9–10.)  Plaintiffs disagree on the grounds that Detective Jacobs initiated their arrests absent probable cause.  (Pls.' Resp. Opp'n 17.)

Qualified immunity exists when a reasonable officer could have believed his conduct was lawful in light of clearly established law.  Moreover, the plaintiff's subjective beliefs are irrelevant

when determining whether the qualified immunity doctrine applies.  See Anderson v. Creighton, 483 U.S. 635, 636 (1987); Green v. City of Patterson, 971 F. Supp. 891, 901 (D.N.J. 1997).  The doctrine provides sufficient room for mistakes in the officer's judgment, and serves to protect "all but the plainly incompetent or those who knowingly violate the law."  Green, 971 F. Supp. at 901 (quoting Orsatti, 71 F.3d at 484) (further citations omitted).  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court established the standard for invoking a qualified immunity defense, stating that: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Id. at 818 (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Court refined this standard by formulating a two-pronged inquiry into the officer's conduct: (1) whether, taken in the light most favorable to the plaintiff, the alleged facts indicate the deprivation of an actual constitutional right; and (2) if so, whether the right was clearly established such that a reasonable officer could have believed that the particular conduct at issue was lawful.  Id. at 201, overruled in part on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); see also Holmes v. Cnty. of Del., No. Civ.A.04-4794, 2007 WL 954122, at *4 (E.D. Pa. Mar. 28, 2007); Pagan v. Ogden, No. Civ.A.09-00002, 2010 WL 3058132, at *6 (E.D. Pa. July 30, 2010);  Bergdoll v. City of York, No. Civ.A.08-01879, 2009 WL 25093, at *7–8 (M.D. Pa. Jan. 5, 2009).  In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court held that the sequence of the Saucier inquiry is not mandatory, and that district courts should exercise their "sound discretion" in determining which prong to address first.  Id. at 236; see also Pagan, 2010 WL 3058132, at *6;  Verdier v. Borough, 796 F. Supp. 2d 606, 630 (E.D. Pa. 2011).

The first prong of Saucier instructs the Court to consider whether the facts alleged by the

16

plaintiff indicate that the officer's conduct violated a constitutional right.  Saucier, 533 U.S. at 201.

"Although prosecution without probable cause is not, in and of itself, a constitutional tort, it can be

a constitutional tort if [the] plaintiff can demonstrate a deprivation of liberty consistent with the

concept of 'seizure.'" Brockington v. City of Phila., 354 F. Supp. 2d 563, 568 (E.D. Pa. 2005)

(internal citations and quotations omitted).  In the instant case, Plaintiffs allege that Detective Jacobs

deprived them of their Fourth Amendment[2] right to be free from malicious prosecution.[3]  (Am.

Compl. ¶¶ 70–76.)  As such, the first prong of the Saucier inquiry is satisfied.

The second prong of Saucier requires consideration of whether the alleged constitutional

rights were clearly established such that a reasonable officer could have believed that the particular

conduct at issue was lawful.  Saucier, 533 U.S. at 201.  "It [i]s clearly established that a violation of

common law malicious prosecution along with 'some deprivation of liberty consistent with the

concept of "seizure"' constitutes a violation of the [C]onstitution." Brockington, 354 F. Supp. 2d

at 569 (quoting Gallo v. City of Phila., 161 F.3d 217, 222 (3d Cir. 1998)) (further citation omitted).

As discussed in detail in Section A above, Plaintiffs have proffered enough evidence to create a

genuine issue of material fact as to each of the five elements of malicious prosecution.  Moreover,

Plaintiffs have adduced sufficient evidence to demonstrate that they suffered a deprivation of liberty

---

[2]  "The right of the people to be secure in their persons . . . against unreasonable . . .
seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported
by Oath or affirmation, and particularly describing . . . the persons . . . to be seized."  U.S. Const.
amend. IV.

[3] Plaintiffs also assert a deprivation of their Fourteenth Amendment rights.  (Am. Compl.
¶¶ 70–76.)  The Fourth Amendment is made applicable to the states through the Fourteenth
Amendment.  See Albright v. Oliver, 510 U.S. 266, 272–73 (1994) (citing Mapp v. Ohio, 367
U.S. 643 (1961)) (further citation omitted).  The Court's consideration of Plaintiffs' Fourteenth
Amendment allegations is therefore subsumed within its discussion of their Fourth Amendment
claim.

consistent with the concept of a "seizure" in the constitutional context.  It is well recognized law that an arrest constitutes a deprivation of liberty under the Fourth Amendment, see Torres v. McLaughlin, 163 F.3d 169, 174 (3d Cir. 1998) (citing Albright v. Oliver, 510 U.S. 266, 274 (1994)), and it is undisputed from the record here that all three Plaintiffs were arrested.  In fact, if the facts are interpreted in the light most favorable to the Harris siblings—as they must be at this stage of the proceedings—the manner in which Plaintiffs' arrests were executed was particularly egregious. Angell testified that police officers appeared at her home in the early morning hours to arrest her while she was naked in the shower, and they handcuffed her in the presence of her crying young children.  (Angell Dep. 19:19–21:18.)  Lorria testified to similarly egregious factual circumstances surrounding her arrest.  According to Lorria, the officers present at Angell's arrest apparently told her family that they had an arrest warrant for her as well.  (Lorria Statement.)  She therefore repeatedly tried to contact several different police departments and criminal justice centers in Philadelphia, but no one was apparently able to provide her with any further information.  (Id.)  Over the course of several days, she apparently attempted to turn herself in several times, but was not taken into custody because the system did not indicate that a warrant had been issued for her arrest. (Id.)  Lorria finally met with Detective Jacobs, who apparently told her that he wanted to arrest her and Angell because he did not like their brother and "wanted to teach him a lesson."  (Id.)  As such, if taken as true, the particularly aggressive manner in which Plaintiffs' arrests were executed further supports a finding of a deprivation of liberty under these circumstances.

Thus, the only remaining inquiry is whether Detective Jacobs could have believed that his conduct was lawful in light of these clearly established constitutional rights.  On this point, Plaintiffs contend that Detective Jacobs could not have believed that his conduct was lawful because he lacked

probable cause to effectuate their arrests, and that, had he bothered to investigate further, he would have uncovered exculpatory evidence. (Pls.' Resp. Opp'n 13–17.) As indicated above, "[i]t is black letter law that 'probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been committed by the person to be arrested.'" Grendysa v. Evesham Twp. Bd. of Educ., No. Civ.A.02-1493, 2005 WL 2416983, at *8 (E.D. Pa. Sept. 27, 2005) (quoting Orsatti, 71 F.3d at 482) (further citation omitted). Therefore, "it is the function of the Court to determine whether the objective facts available to" Detective Jacobs at time he filed the affidavits of probable cause "were sufficient to justify a reasonable belief that [Plaintiffs] had committed the crimes" that they were charged with. Grendysa, 2005 WL 2416983, at *8. An assessment of whether Defendant acted reasonably under these circumstances is a fact-intensive inquiry. Gerhart v. Commonwealth of Pa., No. Civ.A. 09-1145, 2009 WL 2581715, at *5 (E.D. Pa. Aug. 13, 2009). Therefore, the Court should be mindful of the fact that "a decision on qualified immunity [can] be premature when there are unresolved disputes of . . . fact relevant to the immunity analysis." Id. at *5 (quoting Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002)).

In this case, there are simply too many unsettled facts present in order for the Court to definitively ascertain whether Detective Jacobs had probable cause to effectuate Plaintiffs' arrests. On the one hand, a careless and incomplete investigation does not automatically preclude a finding of probable cause. See Grendysa, 2005 WL 2416983, at *9 ("[T]he fact that [Detective] Troso did not undertake the best possible investigation does not preclude a finding of finding of probable cause."); see also Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 786 (3d Cir. 2000). Indeed, Detective Jacobs's investigation of this matter would have certainly been better and more complete

19

had he interviewed Plaintiffs and Officers Holt and Long, or consulted available medical records and police documentation related to the incidents in question prior to setting Plaintiffs' arrests in motion. In fact, at his deposition, Detective Jacobs acknowledged that it was proper investigatory protocol for detectives in his Department to attempt to interview defendants—here, the Harris siblings—to ascertain "the actual facts of the case" prior to swearing out an affidavit of probable cause upon which their arrest would be based.  (Jacobs Dep. 61:21–24, 62:10–17.)  The Court therefore does not outright disagree with Plaintiffs' assertions that Detective Jacobs's overall investigation was "sloppy" and "incompetant."  (Pls.' Resp. Opp'n 7.)

On the other hand, the Court gives weight to the significant number of serious crimes with which Plaintiffs were charged here, particularly in light of the fact that Detective Jacobs had potentially exculpatory evidence in his possession and that he effectuated Plaintiffs' arrests based solely on the few statements made to him by Adams.  While Detective Jacobs may have perhaps had probable cause to effectuate Plaintiffs' arrests for *some* of the crimes based on the facts that were before him at the time, the Court seriously questions whether he had probable cause to arrest them for *six* felonies and *six* misdemeanors, including serious crimes such as burglary, criminal conspiracy, terroristic threats, and obstruction of justice.  (Affs. Probable Cause.)  As such, the Court declines to find that Detective Jacobs could have reasonably believed that his conduct was lawful under these circumstances.  Accordingly, Detective Jacobs is not entitled to shield himself from liability with the protective armor of qualified immunity.

C.      **Municipal Liability**[4]

In the seminal case of <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court held that § 1983 applies to municipalities and other local government units.  <u>Id.</u> at 690.  To impose § 1983 liability on such a governing body, a plaintiff must show that the municipality engaged in some "action pursuant to [an] official municipal policy . . . [that] caused a constitutional tort."  <u>Id.</u> at 691.  However, "it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality."  <u>Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown</u>, 520 U.S. 397, 404 (1997).  Rather, the plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.  <u>Id.</u>; <u>see also</u> <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged) (internal citation and quotations omitted).

Since <u>Monell</u>, the Supreme Court has articulated several ways in which a plaintiff can impose liability on a municipality pursuant to § 1983, including the presence of a policy of inadequate training or supervision or the existence of a municipal custom.  In the instant case, the parties conflate the policy and custom standards.  "The two theories are significantly different, however, and must be analyzed separately." <u>Jones v. Dalton</u>, No. Civ.A.09-138, 2012 WL 1134895, at *10 (D.N.J.

---

[4] Plaintiffs are suing Detective Jacobs in both his individual and official capacities.  (Am. Compl. ¶ 10.)  The Supreme Court has stated that suits against officers acting in their official capacity should be treated as suits against the government entity itself "[b]ecause the real party in interest . . . is the governmental entity and not the named official, [and thus] 'the entity's policy or custom must have played a part in the violation of federal law.'"  <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991) (quoting <u>Monell</u>, 436 U.S. at 694) (further citation omitted).  As such, the Court treats all claims asserted Detective Jacobs in his official capacity as suits against the City of Philadelphia.

Apr. 3, 2012).   The Court therefore discusses each theory of municipal liability separately below.

"Establishing municipal liability on a failure to train claim under § 1983 is difficult." Rudzick v. City of Phila., No. Civ.A.07-1383, 2008 WL 5188792, at *5 (E.D. Pa. Dec. 10, 2008). In City of Canton, Ohio v. Harris, 489 U.S. 378 (1989), the Supreme Court held that, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality . . . can [it] be liable for such a failure under section 1983."   Id. at 389.   The Court further noted that "the inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." Id.; see also Frohner v. City of Wildwood, No. Civ.A.07-1174, 2008 WL 5102460, at *11 (D.N.J. Dec. 1, 2008).   "To survive summary judgment on a failure to train theory, [plaintiffs] must present evidence that the need for more or different training was *so obvious* and *so likely* to lead to the violation of constitutional rights that the policymaker's failure to respond amount[ed] to deliberate indifference." Hogan v. City of Easton, No. Civ.A.04-759, 2006 WL 3706237, at *12 (E.D. Pa. Dec. 12, 2006) (citing City of Canton, 489 U.S. at 390) (emphasis added).   Such evidence usually entails "proof of a pattern of underlying constitutional violations [which] demonstrate[s] that the inadequate training caused a constitutional violation."   Rudzick, 2008 WL 5188792, at *5 (citing Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004)).

Here, Plaintiffs allege that Detective Jacobs's actions were "caused by the failure of Defendant, City [of Philadelphia] . . . to properly train, control or supervise with respect to investigative power in accordance with the United States [ ] Constitution[.]" (Am. Compl. ¶ 80.) Plaintiffs specifically allege that "[t]he City of Philadelphia consistently exhibited a pattern . . . [of] not requir[ing] its police detectives to interview or obtain a statement from patrol officers at the

scene of the incident giving rise to the criminal conduct." (Pls.' Resp. Opp'n 19.) Plaintiffs have

adduced no evidence, however, to support this statement. Notably, the record lacks any indication

that the City of Philadelphia had previously engaged in similar conduct such that one could find that

it has a pattern of constitutional violations. Nor have Plaintiffs provided any evidence that "the need

for more or different training was so obvious and so likely to lead to the violation of constitutional

rights" that the City's failure to respond to this alleged need amounted to deliberate indifference.

Hogan, 2006 WL 3706237, at *12. Given this lack of evidentiary proof, Plaintiffs cannot hold the

City liable under a failure to train theory of municipal liability.

Plaintiffs also assert that the City of Philadelphia had a custom of engaging in Fourth

Amendment violations in regard to the investigative procedure utilized by its detectives. "Unlike

a 'policy,' which comes into existence because of the top-down affirmative decision of a

policymaker, a custom develops from the bottom-up. Thus, the liability of a municipality for

customary constitutional violations derives not from its creation of the custom, but from its tolerance

or acquiescence in it." Britton v. Maloney, 901 F. Supp. 444, 450 (D. Mass. 1995); see also

McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009) ("Custom requires proof of knowledge

and acquiescence by the decisionmaker."). Federal courts have routinely recognized that "an act

becomes a custom when, though not authorized by law or a decisionmaker, it 'is so widespread as

to have the force of law.'" Jones, 2012 WL 1134895, at *11 (quoting Brown, 520 U.S. at 404)).

Moreover, when asserting a claim against a municipality based on a theory of customary

constitutional violations, the plaintiff bears the burden of proving that the municipal practice was

the proximate cause of his injuries. Jones, 2012 WL 1134895, at *11 (citing Beck v. City of

Pittsburgh, 89 F.3d 966, 972 n.6 (3d Cir. 1996)). "Causation can be established by showing [that]

'policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to the[ ] [plaintiff's] injury.'" Jones, 2012 WL 1134895, at *11 (citing Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990)).

Here, Plaintiffs also fail to establish a custom of constitutional violations on the City's part. In their Response Brief, Plaintiffs assert that the City "does not require its police detectives to interview or obtain a statement from patrol officers at the scene of the incident" and that it "does not require cooperation or discussion amongst its police when investigating serious felonies." (Pls.' Resp. Opp'n 19.)  Once again, however, Plaintiffs' assertions ring hollow because they fail to provide any evidentiary support.  There is nothing in the record which indicates a custom of deficient investigation that is so widespread in the Philadelphia Police Department that it can be said to have the force of law behind it.  Even more so, Plaintiffs fail to prove—as they have the burden of doing—causation.  The record is noticeably devoid of any indication that Philadelphia policymakers "were aware of similar conduct in the past, but failed to take precautions against future violations[.]" Jones, 2012 WL 1134895, at *11 (internal citation omitted). While Plaintiffs have certainly shown that, in this particular instance, adherence to investigatory protocol was lacking and that the detective assigned to their case conducted his investigation in a shoddy and careless manner, this is not enough to constitute a cognizable claim based on an unconstitutional municipal custom.  Absent evidence of prior unlawful conduct, Plaintiffs cannot show that it was customary for the City of Philadelphia to deprive individuals of their constitutional rights when conducting investigations.

Accordingly, Plaintiffs' municipal liability claims against Defendants fail as a matter of law, and summary judgment is entered in the City of Philadelphia's favor on these grounds.

24

C.    **Spoliation of the Investigation File**

In their Response in Opposition, Plaintiffs seek spoliation sanctions against Defendants as a penalty for Defendants' loss and/or destruction of Detective Jacobs's file regarding his investigation of the Harris siblings.  More specifically, Plaintiffs allege that the investigatory file was "the central piece of evidence to the[ir] claims and defenses," and that they were prejudiced by its loss and/or destruction.

It is well-settled that "[a] party which reasonably anticipates litigation has an affirmative duty to preserve relevant evidence."  Bowman v. Am. Med. Sys. Inc., No. Civ.A.96-7871, 1998 WL 721079, at *3 (E.D. Pa. Oct. 9, 1998); see also Hohider v. United Parcel Serv., Inc., 257 F.R.D. 80, 82 (W.D. Pa. 2009) (same).  "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  Chirdo v. Minerals Techs., Inc., No. Civ.A.06-5523, 2009 WL 2195135, at *1 (E.D. Pa. July 23, 2009) (quoting Mosaid Techs., Inc. v. Samsung Elec. Co., Ltd., 348 F. Supp. 2d 332, 335 (D.N.J. 2004)).  The Third Circuit has provided the district courts with the following elements to assist in the determination of whether sanctions are appropriate:

> (1) The degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

Bull v. United Parcel Serv., Inc., 665 F.3d 68, 79 (3d Cir. 2012) (citing Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 79 (3d Cir. 1994)).  "Evidence of spoliation may give rise to sanctions [which] include: dismissal of a claim or granting judgment in favor of a prejudiced party;

suppression of evidence; an adverse inference, referred to as the spoilation inference; fines; and attorneys' fees and costs.'" Chirdo, 2009 WL 2195135, at *1 (quoting Mosaid Techs., 348 F. Supp. 2d at 335). Here, Plaintiffs request spoilation sanctions in the form of denial of summary judgment, the imposition of fines and attorneys' fees and costs, and an adverse inference instruction at trial. (Pls. Resp. Opp'n 13.)

The first factor instructs the Court to consider the degree of Defendants' fault in destroying and/or losing the file. In order to hold Defendants liable under this factor, "a finding of bad faith is pivotal." Bull, 665 F.3d at 79 (internal citations omitted). At his deposition, Detective Jacobs testified that he recalled creating an investigatory file, but that it was likely stored in the Department's archives since he compiled it over four years ago. (Jacobs Dep. 32:14–24.) Subsequent e-mail exchanges between counsel indicate that Defendants attempted to locate the file, but discovered that its contents had been either lost or destroyed. (03/16/12 E-mail Exchange.) Any copies of the file's contents which could be recovered elsewhere, however, were provided to Plaintiffs. (Jacobs Dep. 56:8–15.) As such, the record here does not indicate the presence of any bad faith conduct. Moreover, the Third Circuit has previously recognized that "[n]o unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Bull, 665 F.3d at 79 (internal citations omitted). The first factor therefore weighs strongly against the entry of spoilation sanctions in this case.

The second factor requires consideration of the degree of prejudice felt by Plaintiffs as a result of the spoilation of the evidence. On this point, the Court finds that Plaintiffs have not suffered a severe degree of prejudice from the loss and/or destruction of the investigation file

26

because they have not shown that any of its contents would change the present outcome.  Even with the full and complete file before it for review, the Court would nonetheless find that the rest of the record indicates that genuine issues of material fact remain regarding Plaintiffs' malicious prosecution claim against Detective Jacobs.   Furthermore, neither party disputes that the investigation file did not contain any evidence of an unconstitutional policy or custom on the City's part upon which municipal liability could be premised.  Thus, given that the Court would nonetheless reach the same result even with the benefit of the full investigation file before it, the degree of prejudice felt by Plaintiffs due to the loss and/or destruction of the file is minimal under these circumstances.

Finally, the third factor provides that the Court should consider whether any lesser sanction is available.  Since the degree of Defendants' fault and Plaintiffs' prejudice are both minimal here, the Court does not believe that spoliation sanctions are at all appropriate under these circumstances.  As to the punishment of Detective Jacobs regarding the careless manner in which he conducted his investigation, the Court believes that this is best left to the discretion of appropriate supervisory personnel at the Philadelphia Police Department.

Accordingly, Plaintiffs' request for spoliation sanctions is denied.

## IV.   CONCLUSION

For the aforementioned reasons, summary judgment is denied as to the malicious prosecution claim asserted against Detective Jacobs.  Detective Jacobs is likewise not entitled to the affirmative defense of qualified immunity based on the present factual record.  Summary judgment is granted in Defendants' favor, however, on Plaintiffs' municipal liability claims.  Furthermore, Plaintiffs' requests for spoliation sanctions as a result of the loss and/or destruction of Detective Jacobs's investigation file is denied.

An appropriate Order follows.